# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Casey Little,

                Plaintiff,

                            Case No. 1:20-cv-3334-MLB

v.

Norfolk Southern Corporation,

                Defendant.

_____/

## AMENDED OPINION & ORDER[1]

Plaintiff Casey Little sued Defendant Norfolk Southern Corporation for discrimination and retaliation under § 4311 of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). Defendant moves for summary judgment. (Dkt. 55.) The Court held oral argument on July 25, 2022. The Court denies Defendant's motion.

---

[1] The Court **STRIKES** footnote 1 from its order entered on August 29, 2022 (Dkt. 84 at 1, n.1).

## I.   Background[2]

Plaintiff served in the Army from 2003 to 2008.  (Dkts. 55-2 ¶ 1; 71-1 ¶ 1; 71-2 ¶ 2; 76 ¶ 2.)  He joined the National Guard in 2010.  (*Id.*) Plaintiff disclosed his military service and his desire to continue working as a member of the National Guard when he applied to work for Defendant.  (Dkts. 55-2 ¶ 4; 71-1 ¶ 4; 71-2 ¶ 6; 76 ¶ 6.)  Defendant hired Plaintiff as a management trainee in January 2013.  (Dkts. 55-2 ¶ 5; 71-1 ¶ 5; 71-2 ¶ 5; 76 ¶ 5.)   Plaintiff remained an active member of the National Guard during his employment with Defendant (except for one period of 18 to 24 months).  (Dkts. 55-2 ¶ 1; 71-1 ¶ 1.)

While employed with Defendant, Plaintiff moved frequently to different stations.   (Dkts. 55-2 ¶ 6; 71-1 ¶ 6.)   He started out as a Transportation Associate in Jacksonville, Florida; Brunswick, Georgia; and Augusta, Georgia.  (Dkts. 71-2 ¶ 7; 76 ¶ 7.)  He became Assistant Trainmaster in Augusta in May 2014.  (Dkts. 55-2 ¶ 9; 71-1 ¶ 9; 71-2 ¶ 9;

---

[2] For depositions, the Court cites the page numbers applied by CM/ECF. The Court notes that the parties assume some level of familiarity with railroad terminology and customs throughout their briefing.  The Court has tried to make their references more readable and advises the lawyers to speak more plainly and less technically in the future.  To the extent the Court's explanation of the facts are confusing or wrong, the fault lies with the litigants.

76 ¶ 9.)  In that role, he supervised subordinate employees and assisted the Trainmaster with the overall management of the assigned terminals. (Dkts. 55-2 ¶ 10; 71-1 ¶ 10.)  In May 2015, Defendant transferred Plaintiff to Griffin, Georgia.  (Dkts. 55-2 ¶ 12; 71-1 ¶ 12.)  Plaintiff continued working as an Assistant Trainmaster in that location.  (*Id*.)  At about that time, Plaintiff also became an active member of the Georgia National Guard.  (Dkts. 71-2 ¶ 10; 76 ¶ 10.)[3]

In October 2016, Defendant promoted Plaintiff to Trainmaster and transferred him to Brunswick, Georgia.  (Dkts. 55-2 ¶ 13; 71-1 ¶ 13; 71-2 ¶ 16; 76 ¶ 16.)  In that role, he was the senior supervisor at the station, had an Assistant Trainmaster, and managed all rail operations in Brunswick, including budgeting, customer services, safety, and general movement of rail traffic.  (Dkts. 55-2 ¶ 14; 71-1 ¶ 14.)[4]  His pay increased from the so-called "B3 pay band" to the "B4 pay band."  (Dkts. 55-2 ¶ 13; 71-1 ¶ 13.)

---

[3] He had previously been an inactive member of the Tennessee National Guard.  (Dkts. 71-2 ¶ 10; 76 ¶ 10.)
[4] Defendant renamed trainmasters to road managers in 2018, but the responsibilities of a person holding that title remained the same.  (Dkts. 55-2 ¶ 16; 71-1 ¶ 16; *see also* Dkt. 63 at 71:8–16.)

3

Sometime in late spring or early summer 2018, Plaintiff notified Defendant that he expected to be deployed by the National Guard to serve in Afghanistan. (Dkts. 55-2 ¶ 19; 71-1 ¶ 19.) On September 30, 2018, he notified Defendant that his deployment would begin on October 16 of that year. (Dkts. 55-2 ¶ 21; 71-1 ¶ 21; 71-2 ¶ 23; 76 ¶ 23.) The next day, Todd Reynolds (the General Manager of Defendant's Georgia Division) thanked Plaintiff for his service and said Defendant would be looking forward to his return. (Dkts. 55-2 ¶ 22; 71-1 ¶ 22.) Right before Plaintiff left for deployment, Defendant promoted him to Senior Road Manager, which included another raise. (Dkts. 55-2 ¶ 24; 71-1 ¶ 24.)

During Plaintiff's military leave, Defendant hired Mike Farrell as its Vice President of Operations. (Dkts. 55-2 ¶¶ 28–29; 71-1 ¶¶ 28–29.) Farrell instituted a new mandatory "trigger and escalation system." (Dkts. 55-2 ¶ 29; 71-1 ¶ 29.) That system required trainmasters and managers to anticipate problems before they arose, attempt to fix those problems if possible, and (if not) "trigger and escalate" the problem up the chain of command to ensure others worked on a solution. (Dkt. 57 at 30:1–31:1.) The purpose of the trigger and escalation system was to anticipate and fix problems before they arose, rather than talking about

them the next day.  (*Id.* at 31:2–6.)   If a train was going to be delayed, for example, that conclusion would trigger the trainmaster or manager to escalate the issue up the chain of command.  (Dkts. 55-2 ¶ 31; 71-1 ¶ 31.)   The protocols for the trigger and escalation system were documented and distributed to employees.  (Dkts. 55-2 ¶ 35; 71-1 ¶ 35.)  Farrell also emphasized several "key disciplines" and "core principles." (Dkts. 55-2 ¶ 29; 71-1 ¶ 29.)  The key disciplines were (1) run trains on time; (2) switch all cars in six hours or less; (3) right car, right train, right block; and (4) safety.  (Dkts. 55-2 ¶ 36; 71-1 ¶ 36.)  The core principles were (1) serve customers; (2) manage assets; (3) control cost; (4) work safely; and (5) develop people.  (Dkts. 55-2 ¶ 36; 71-1 ¶ 36.)  Farrell also instituted what the parties refer to (but do not define) as "Precision Scheduled Railroading."  (Dkts. 55-2 ¶ 30; 71-1 ¶ 30.)

Around August 2019, Plaintiff spoke with Defendant about reinstatement following his deployment.  (Dkts. 55-2 ¶ 42; 71-1 ¶ 42.)  He asked to be placed in the Alabama division.  (Dkts. 55-2 ¶ 43; 71-1 ¶ 43.)  Plaintiff told Neil Palmer (an employee in the Alabama division) that he wanted to be near Memphis, Tennessee because some of his children lived there.  (Dkts. 55-2 ¶¶ 44–45; 71-1 ¶¶ 44–45.)  In October 2019, Plaintiff

met with Eric Peters (Division Superintendent of the Alabama division). (Dkts. 55-2 ¶ 46; 71-1 ¶ 46.)  Peters said Plaintiff would be placed in Sheffield, Alabama as the Senior Terminal Manager.  (Dkts. 55-2 ¶ 46; 71-1 ¶ 46.)  Plaintiff was excited about the opportunity.  (Dkts. 55-2 ¶ 48; 71-1 ¶ 48.)  He signed a Relocation Repayment Agreement before moving to the Sheffield facility and started working there in mid-October 2019. (Dkts. 55-2 ¶¶ 49, 51; 71-1 ¶¶ 49, 51; 71-2 ¶ 24; 76 ¶ 24.)  He began by shadowing John Hill (the employee he was replacing).  (Dkts. 55-2 ¶ 54; 71-1 ¶ 54; 71-2 ¶ 32; 76 ¶ 32.)

As Senior Terminal Manager, Plaintiff participated in daily morning calls; managed traffic in and out of the station; performed rule checks; worked on budgeting and planning; handled shift turnovers; investigated and provided support for accidents and injuries; and managed the supervisors on his team.  (Dkts. 55-2 ¶ 52; 71-1 ¶ 52.) Plaintiff had three subordinate trainmasters: Jim Ellison, Beverly Smith, and Connor Dawson.  (Dkts. 55-2 ¶ 52; 71-1 ¶ 52; 71-2 ¶ 138; 76 ¶ 138.)  His immediate supervisor was Brent Reynolds, Superintendent of Terminals in Chattanooga.  (Dkts. 55-2 ¶ 53; 71-1 ¶ 53.)

On November 29, 2019, Plaintiff missed a trigger for a train that exceeded its allowable dwell time—that is, the amount of time it was supposed to say in the station. (Dkts. 55-2 ¶ 62; 71-1 ¶ 62.)[5]  Brent Reynolds discussed the problem with Plaintiff and issued a written warning. (Dkts. 55-2 ¶ 64; 71-1 ¶ 64; *see also* Dkt. 63-1 at 41.)  Brent Reynolds expressed concern that Plaintiff had failed to recognize the problem until Brent Reynolds pointed it out to him. (Dkts. 55-2 ¶ 63; 71-1 ¶ 63; *see also* Dkt. 63-1 at 41.)  That same day, Brent Reynolds issued a written warning to two other managers (Williams and Brown) for similar problems. (Dkts. 55-2 ¶ 65; 71-1 ¶ 65; *see also* Dkt. 58-1 at 11–12.)[6]

Brent Reynolds completed Plaintiff's 2019 performance review and gave Plaintiff an overall rating of "solid performer," qualifying Plaintiff

---

[5] Plaintiff disputes this assertion of fact, arguing the deposition citation does not support it.  That is correct.  It appears Defendant miscited the transcript from Plaintiff's deposition.  He did, however, concede having missed the trigger. (Dkt. 63 at 131:2–19.)  So, the fact is nevertheless accepted by the Court as undisputed.

[6] Plaintiff objects to this fact on the ground that there is no foundation Williams and Brown are materially similar comparators to Plaintiff apart from having the same supervisor. (Dkt. 71-1 ¶ 65.)  But whether someone is a materially similar comparator is a legal issue.

for a 2020 annual merit raise.  (Dkts. 55-2 ¶ 66; 71-1 ¶ 66; *see also* 63-1

at 51.)  In the review, however, Brent Reynolds wrote:

> [Plaintiff] is recently back to us after a year[']s leave.  He has
> come back at [a] time where major changes have occurred in
> our operations and expectations.  [Plaintiff] has taken longer
> to get up to speed on items than I would have expected.  He
> has to quickly learn the processes, procedures, and measures
> of the company now.  He has to understand and apply them.
> He needs to be the driver . . . of this terminal, which he has
> only recently shown the capability of being.  [Plaintiff] has
> struggled with triggers and escalations, which he has again
> shown improvement on.  It is my expectation that he is able
> to quickly understand and apply the processes, understand
> the expectations, and drive the changes of this terminal as it's
> [sic] leader, and do so . . . more quickly than he has to this
> date.

(Dkt. 63-1 at 51.)  On January 18, 2020, Peters emailed all supervisors in

the Alabama division (including Plaintiff) saying:

> Cannot believe I have been forced to feel the need to write this
> email, but we continue to fail to properly apply the
> trigger/escalation process and/or assume someone else is
> relaying the information.  To be ***CRYSTAL CLEAR*** the NOC
> does communicate with Division Officers, but this ***DOES
> NOT*** change your responsibility to follow the triggers and
> chain of command.  If you have any questions on expectations
> you better raise your hand and ask.

(Dkt. 67-1 at 21 (emphasis in original); *see also* Dkts. 71-2 ¶ 39; 76 ¶ 39.)

In February 2020, Defendant shuffled personnel in the Alabama

division: Todd Reynolds became the General Manager of the Southern

Region, Frank Gilley replaced Eric Peters as the Division Superintendent, and Thomas Murphy replaced Brent Reynolds as the Superintendent of Terminals for Chattanooga. (Dkts. 55-2 ¶ 67; 71-1 ¶ 67.) Gilley immediately noticed the Sheffield facility was not performing as well as expected, particularly in regard to station dwell times. (Dkt. 65 at 51:17–52:7; *see also* Dkts. 55-2 ¶ 69; 71-1 ¶ 69.) Murphy, however, said the concern about station dwell applied to all the trains in the Alabama division, not just those at the Sheffield facility. (Dkts. 64 at 147:15–148:9; 71-1 ¶ 69.) According to Gilley, Plaintiff kept saying Sheffield was "fine" and "on schedule." (Dkt. 62 ¶ 8.) Gilley says he asked Plaintiff if his station plan for Sheffield was adequate and offered to help Plaintiff adjust his plan as necessary. (Dkts. 55-2 ¶ 71; 71-1 ¶ 71; *see also* Dkt. 62 ¶ 8.) Defendant claims Plaintiff said he was not having any problems with his station plan. (*Id.*) Plaintiff says this conversation never happened. (Dkts. 55-2 ¶ 71; 71-1 ¶ 71; *see also* Dkt. 71-3 ¶ 23.)

In an email dated February 27, 2020, Janea Parr (Director of Train Services) and Gilley asked Plaintiff and his team for time studies. (Dkts. 55-2 ¶ 72; 71-1 ¶ 72.) Defendant apparently uses time studies to figure

out the time needed to complete all necessary work on a train while it is in a station.   (Dkts. 55-2 ¶ 73; 71-1 ¶ 73.)   Time studies were not new, and Gilley believed Plaintiff should have known how to complete them. (Dkts. 55-2 ¶ 74; 71-1 ¶ 74.)[7]  In response, Plaintiff forwarded to Gilley and Parr an email he had sent to Murphy several months before that contained aggregated time data.   (Dkt. 62-1 at 2–3.)   Gilley was not satisfied.   He responded: "We need actual times from your time study. We normally check at least 3 events to see what is actually taking place. If you have them, email Ms. Parr today.   If not[,] have this completed and turned in by Saturday."  (*Id.* at 2.)   Plaintiff then sent back data on three

---

[7] Plaintiff objects to this fact saying it mischaracterizes the evidence and is misleading.  (Dkt. 71-1 ¶ 74.)  His two-page objection, however, never adequately explains why.  The evidence he cites has no bearing on the fact asserted.  As an example, Plaintiff notes "Murphy testified that the collection of dwell time data, not the vague 'train studies' data, was a 'new push that had happened sometime there in February about how long trains stayed in stations.  It was called station dwell.'"  (*Id.* (citing Dkt. 64 at 147:15–17).)  But *that* is misleading.  The cited portion of Murphy's deposition explains only that there was a "new push" to get data on station dwell in February 2020; he said nothing about time studies.  (Dkt. 64 at 147:15–17.)   In other words, none of the evidence Plaintiff cites changes the fact that Gilley testified by declaration that the "time studies have been done for as long as [Gilley had] been on the railroad.  It was not something new, and it was something that [Plaintiff] should have known how to complete."  (Dkt. 62 ¶ 9.)  If there is any distinction here, the parties do not adequately explain it.

trains.  (*Id.*)  Gilley (still not happy) replied, "3 trains?  That's not going to cut it.  I want everyone out with a stopwatch getting time studies." (*Id.*)  Gilley testified by declaration he and his team needed at least three time studies from each work event to gather an average, and "[m]easuring three trains and various work events that those three trains completed did nothing to get an average."  (Dkt. 62 ¶ 9.)

On March 2, 2020, Plaintiff emailed Gilley, Murphy, and Parr a six-train data set.  (Dkt. 60-1 at 18.)  Murphy said it was a "good start" but "let's get into the weeds."  (*Id.*)  He provided an example and suggestions.  (*Id.*)

On March 5, a train at Plaintiff's station exceeded station dwell by 8.5 hours.  (Dkts. 55-2 ¶ 76; 71-1 ¶ 76.)  Plaintiff spoke with Murphy about it but did not use the word "trigger."  (Dkts. 55-2 ¶ 76; 71-1 ¶ 76.) Murphy admitted, however, that one way an employee can escalate an issue is by discussing it with a supervisor.  (Dkt. 64 at 113:15–114:5.) According to Plaintiff, Murphy "caught some heat" from Parr about the issue, so Plaintiff emailed Parr to make sure Parr understood Plaintiff had not told Murphy there was a trigger.  (Dkts. 55-2 ¶ 76; 71-1 ¶ 76; 63 at 171:20–172:22; 63-1 at 58 ("I failed to properly escalate this 101 issue

to Mr. Murphy.  We've discussed it and it won't happen again.").)  In other words, Plaintiff did something about the problem (spoke with Murphy) but did not follow the proper procedure (issue a trigger).

On March 7, Murphy followed up on the train study issue by outlining the data Plaintiff needed to be collected for Gilley and Parr. (Dkts. 55-2 ¶ 79; 71-1 ¶ 79; 60-1 at 12.)  Plaintiff collected the data and sent it to Parr and Murphy.  (Dkt. 60-1 at 21–22.)  On March 20, Murphy forwarded that data to Teona Edwards.  (*Id.* at 21.)  Edwards asked Murphy to have Plaintiff provide "more data points."  (*Id.* at 21.)  Upon receiving those instructions, Plaintiff said he was confused by the request and asked if Edwards wanted more detail or more samples.  (*Id.* at 20.) Murphy replied, "both."  (*Id.*)  Plaintiff said he could get more samples but did not understand the request for more details.  (*Id.*)  Plaintiff was clearly looking for guidance as to how he should respond.  (*Id.*)  On the record before the Court, it is unclear whether Plaintiff received that guidance or complied with the requests.  (Dkts. 55-2 ¶ 80; 71-1 ¶ 80.)[8]

---

[8] Gilley testified in his deposition that he could not recall whether Plaintiff complied.  (Dkt. 65 at 43:25–44:4.)  But in his declaration, he says Plaintiff never complied.  (Dkt. 62 ¶ 9 ("He simply did not do it. To my knowledge, he never complied. I never received the correct data from

After his shift ended on March 12, Plaintiff left for vacation until March 22.  (Dkts. 55-2 ¶ 82; 71-1 ¶ 82; 71-3 ¶ 25.)  Before leaving, he informed Gilley and Murphy that his station was current on switching, meaning the cars were switching within six hours.  (Dkts. 55-2 ¶ 82; 71-1 ¶ 82; *see also* Dkt. 60 ¶ 12.)[9]  Gilley and Murphy later discovered Sheffield was *not* current on switching and had not sent the necessary trigger.  (Dkts. 55-2 ¶ 83; 71-1 ¶ 83.)  Specifically, Murphy discovered a car that had come into the station on March 11 and taken twenty hours to "switch."  (Dkt. 60 ¶ 12; *see also* Dkt. 60-1 at 52.)[10]  Plaintiff denies

---

[Plaintiff].").)  Regardless, there is no evidence Murphy ever provided Plaintiff the guidance Plaintiff requested.

[9] Plaintiff disputes this fact.  But his response is non-responsive.  He claims that, at the time he left for vacation, "the car in question would not have been old enough to send a trigger."  (Dkt. 71-1 ¶ 82.)  But the asserted fact was about the representation Plaintiff made, not the accuracy of it.  At his deposition, Plaintiff could not recall sending the text message and, thus, could not deny doing so.  (Dkt. 63 at 197:22–198:5.)  Defendant provides evidence Plaintiff did (Dkts. 60 ¶12; 64 at 132:7–9), and Plaintiff offers no evidence in dispute.  The Court thus accepts Defendant's asserted fact.

[10] At the hearing, defense counsel explained the data located at line 20 of Dkt. 60-1 shows the train arrived at 9:58 p.m. on March 11, and line 16 shows the train departed at 3:46 p.m. on March 13.  (Dkt. 60-1 at 52.)  Defendant says this supports their position but did not explain how it does to the Court.

responsibility for this error, saying that he was not on duty when the trigger should have been sent.  (Dkt. 71-1 ¶ 83.)

On March 16, Murphy traveled to Sheffield to see the issues for himself and identify the underlying problems.  (Dkts. 55-2 ¶ 86; 71-1 ¶ 86.)[11]  Murphy sent notes of his visit to Gilley.  (Dkts. 55-2 ¶ 87; 71-1 ¶ 87.)  Murphy explained that (1) Plaintiff missed a trigger for cars that had been in the station for over twenty hours before being switched;[12] (2) Plaintiff had instructed his subordinate managers to switch for connection rather than to switch in under six hours, a direct violation of key discipline 2;[13] and (3) he had asked Plaintiff to work on a train derailment before going on vacation, but he had not receive any response

---

[11] Plaintiff disputes this fact saying the cited evidence does not support it.  He is wrong, the declaration states the fact nearly verbatim.  The cited evidence says he did this on or around March 15, rather than on March 16 as alleged in the statement of facts.  That difference is immaterial.

[12] Plaintiff disputes that he missed a trigger for this.  According to Plaintiff, he was on vacation at the time, and Smith was responsible for sending the trigger.  (Dkts. 71-1 ¶ 88; 71-3 ¶ 25.)  Smith was the trainmaster working at the Sheffield terminal at 2:00 a.m. on March 13. (Dkts. 71-2 ¶ 58; 76 ¶ 58.)

[13] Plaintiff disputes that he gave such an instruction as a standing order. He allowed switching by connection only on rare occasions after triggering to Murphy and getting no response.  (Dkt. 71-1 ¶ 89; *see also* Dkts. 55-2 ¶ 90; 71-1 ¶ 90.)  Another instance in which the parties do an awful job of explaining what this means.

from Plaintiff and Plaintiff's team had not heard from Plaintiff about it.[14] (Dkts. 55-2 ¶¶ 88–89, 91; 71-1 ¶¶ 88–89, 91.)  Plaintiff denies he was responsible for these alleged errors but does not deny that Murphy noted the issues.  (Dkts. 55-2 ¶¶ 88–89, 91; 71-1 ¶¶ 88–89, 91.)

On March 23, Plaintiff texted Murphy about Governor Kemp mobilizing 2,000 guardsmen to assist with COVID-19 and the possibility Plaintiff's unit could be among that group.  (Dkt. 64-1 at 63; *see also* Dkts. 55-2 ¶ 92; 71-1 ¶ 92; 71-2 ¶ 62; 76 ¶ 62.)  Plaintiff explained he would keep Murphy "posted" as he got more information.  (Dkt. 64-1 at 63; *see also* Dkts. 55-2 ¶ 92; 71-1 ¶ 92.)  At some point, Murphy and Plaintiff talked on the phone.  (Dkt. 63 at 211:21–212:10.)  The parties dispute what happened during the call.  According to Plaintiff, after he told Murphy his unit would likely be re-deployed, Murphy said, "This is not what I need from you right now" and hung up on Plaintiff.  (*Id.* at 212:11–18; *see also* Dkt. 71-1 ¶ 93.)  Defendant says Murphy made that

---

[14] The train derailed on the morning of March 13.  (Dkts. 71-2 ¶ 59; 76 ¶ 59.)  Plaintiff disputes that Murphy ever spoke to him about handling a derailment.   (Dkts. 71-1 ¶ 91; 63 at 179:22–180:22; 71-3 ¶ 26.) According to Plaintiff, he spoke with two of his subordinates (Smith and Ellison) about the derailment as he left to go on vacation.  (*Id.*)  He testified that both had addressed derailments before, and he "felt like it was handled."  (*Id.*)

comment—not in response to Plaintiff's potential re-deployment—but in response to Plaintiff telling him that Ellison (a Sheffield trainmaster) believed he had contracted COVID-19. (Dkts. 60 ¶ 24; 64 at 144:11–145:17; *see also* Dkt. 55-2 ¶ 93.)

On March 25, Parr complained to Murphy that a car had not been turned properly despite having been returned to Sheffield twice to fix the issue. (Dkt. 63-1 at 63–68.)[15] Murphy sought an explanation from Plaintiff, who replied, "No reason why it wasn't turned. I put the information out prior to going on vacation but clearly that wasn't sufficient." (Dkts. 63 at 184:22–185:15; 63-1 at 63; *see also* Dkts. 55-2 ¶ 94; 71-1 ¶ 94.)

On March 26, Murphy received Sheffield's testing records, which showed Plaintiff had conducted far fewer tests than his subordinates (Smith and Ellison). (Dkts. 55-2 ¶ 95; 60-1 at 38; 71-1 ¶ 95.) The testing records also showed that, while Plaintiff found no violations, Smith and Ellison found some. (Dkts. 55-2 ¶ 95; 60-1 at 38; 71-1 ¶ 95.)[16]

---

[15] Again, the parties offer the Court no greater explanation for what this means.

[16] Plaintiff says these records are misleading because the data was collected while he was on vacation. (Dkts. 60-1 at 38; 71-1 ¶ 95.)

16

On March 27, Parr asked Murphy to work with Plaintiff on something known as a "4hr Report." (Dkts. 55-2 ¶ 96; 60-1 at 43; 71-1 ¶ 96.) Murphy then asked Plaintiff if he had any questions on how to complete the report. (Dkts. 55-2 ¶ 96; 60-1 at 43; 71-1 ¶ 96.) According to Murphy, Plaintiff had trouble getting the report completed. (Dkt. 60 ¶ 18.) Plaintiff says Murphy did not provide him with clear guidance as to how the report should be completed. (Dkt. 71-1 ¶ 96.) Also on March 27, Murphy sent a trigger that Sheffield was taking longer than six hours for switching. (Dkts. 55-2 ¶ 97; 71-1 ¶ 97.) Murphy believed that, if he had not done so, a trigger would not have gone out. (Dkt. 60 ¶ 16.) Plaintiff contends this is speculative because Murphy deprived him of the opportunity to send the trigger. (Dkt. 71-1 ¶ 97.)

On the evening of March 29, Murphy instructed Plaintiff to add Chattanooga traffic to the 102 so that it could get out of the yard— presumably a request that Plaintiff add certain cars to a train headed for Chattanooga, although the parties in their usual fashion do not explain this. (Dkts. 55-2 ¶ 99; 71-1 ¶ 99.) That did not happen. (Dkts. 55-2 ¶ 100; 71-1 ¶ 100.) When Murphy asked why, Plaintiff explained that he had told Smith to do it, but she had not passed that information along to the

third-shift yardmaster.  (Dkt. 60-1 at 41; *see also* Dkts. 55-2 ¶ 100; 71-1 ¶ 100.)  Later that day, Murphy spoke to both Plaintiff and Smith at the same time.  According to Murphy, Smith said Plaintiff never gave her that instruction.  (Dkt. 60 ¶ 17; *see also* Dkts. 55-2 ¶ 101; 71-1 ¶ 101.) Plaintiff did not deny that allegation but instead shrugged and said, "Okay."  (Dkt. 63 at 204:18–205:9; *see also* Dkts. 55-2 ¶ 101; 71-1 ¶ 101.) Plaintiff explained in his deposition that he did not "see any value in getting into a he said/she said who's lying kind of thing."  (Dkt. 63 at 205:4–9.)

On March 30, Murphy again sent a trigger that Sheffield was taking longer than six hours for switching.  (Dkts. 55-2 ¶ 102; 71-1 ¶ 102.) The next morning, Murphy discovered a switch that took 13 hours, with no trigger having been sent by Plaintiff.  (Dkt. 60 ¶ 19; *see also* Dkts. 55-2 ¶ 103; 71-1 ¶ 103.)  Plaintiff says he was not on duty when the trigger should have been sent.  (Dkt. 71-1 ¶ 103.)

Defendant placed Plaintiff on administrative leave later that day. (Dkts. 55-2 ¶ 105; 71-1 ¶ 105.)  Gilley instructed Murphy to document everything at Sheffield and send it to him.  (Dkts. 55-2 ¶ 106; 71-1 ¶ 106.) Murphy sent an email saying that Plaintiff was "not capable of leading

the team in Sheffield." (Dkt. 60-1 at 49; *see also* Dkts. 55-2 ¶ 106; 71-1

¶ 106.) He explained that "triggers are missed on a regular basis when

it comes to switching" and that "after the list of operation and leadership

failures, [he didn't] believe [Plaintiff] had the ability to be a lead

Trainmaster" for Defendant. (*Id.*) As part of this assessment, Murphy

provided the following list of issues:

1. After An test message was sent to myself and Frank Gilley stating you were switching under 6 on Thursday at 1242 pm. I looked in the computer on Friday and FT06 was 20 hours prior to being switched. (Switch list Attached)
2. When questioning the order we switch in, I asked the TM and we switch for connection. I asked who gave the authority deviate from Key Discipline 2, and they told me Casey Little had given those instructions.
3. On Friday morning, there was a derailment in Sheffield, I told Casey Little  you to get involved.  I never heard back from Casey  he provided his team with little to no support.
4. Station Dwell data, Casey has been asked to provide station dwell data to get the accurate work event times since February 27 at 12:14 by Frank Gilley. Since that email only 4 trains have been completed.
5. On Friday March 27 at 1545, I sent a trigger about Sheffield going to go over the 6 hour switching.  Had I not done so no trigger would have been sent.  I told Casey that I took care of the trigger and he needed to handle his triggers and to be proactive.  I told him how Chattanooga will send a trigger when they expect to go over switching based on how many they have on hand to switch,
6. On Monday March 30 at 1438, I sent a trigger about Sheffield switching will be over 6 hours, I again explained to Casey about handling the trigger and that he needs to be proactive.
7. On Tuesday March 31 at 4:57, the morning snap shot was sent out about a 13 hour switch cut, no trigger was sent out stating they would be over 6 hours switching.

8. Yesterday,  I spoke with Casey Little about processes in place and not to manage this operation minute by minute.  Have Yardmaster handle the 4 hour reports(second time) I have had the conversation with Casey.  Casey told him the some of his yardmasters couldn't handle the report, I explained to him that it was an expectation not an option for the yardmasters.  Casey told me he he was pleading for them some not to quit and felt by having them do the extra work they would quit.  I told Casey we don't plead with employees to do their job, we hold them accountable.

9. I told Casey to added Chattanooga traffic to 102  on Sunday night 1645 call in order  to get traffic out of class yard, the train didn't have Chattanooga traffic.  When questioned he blamed Beverly, in text.  When I asked Beverly in front of Casey, he said he didn't turn the information over to her.

(*Id.*)[17]  There is a factual dispute as to whether Murphy recommended demotion to another position or termination.[18]

Gilley forwarded Murphy's email to Todd Reynolds, adding "I agree with Terminal Superintendent Murphy and do not believe [Plaintiff] can add value to [Defendant].  I recommend [Plaintiff] be terminated." (Dkts. 55-2 ¶ 113; 71-1 ¶ 113; 71-2 ¶ 118; 76 ¶ 118.)  Gilley says he did not know Plaintiff's National Guard unit might be re-deployed when he adopted Murphy's recommendation.  (Dkts. 55-2 ¶ 114; 71-1 ¶ 114.)  But Murphy testified he told Gilley about the possibility when Plaintiff told him about it—that is, on March 23.  (*Id.*)  Todd Reynolds approved the termination and gave Gilley permission to send the recommendation to HR, which he did on March 31, 2020.  (Dkts. 55-2 ¶¶ 117–18; 71-1 ¶¶ 117–18.)  Todd Reynolds conducted no independent investigation before giving that approval.  (Dkts. 71-2 ¶ 129; 76 ¶ 129.)

---

[17] Murphy apparently sent Gilley two nearly identical emails in the afternoon on March 31.  (*See* Dkts. 60-1 at 49; 62-1 at 9.)

[18] Citing Murphy's deposition testimony, Defendant says Murphy recommended Plaintiff be demoted to another position and never recommended termination.  (Dkt. 55-2 ¶ 111 (citing Dkt. 64 at 159:16–160:3).)  But, as Plaintiff points out, Gilley testified he does not remember Murphy recommending "something other than termination, such as a demotion."  (Dkt. 71-1 ¶ 111 (citing Dkt. 65 at 62:25–63:4).)

On April 6, Plaintiff told HR that his National Guard unit had been activated. (Dkt. 63-1 at 80; *see also* Dkts. 55-2 ¶ 127; 71-1 ¶ 127.) Defendant terminated Plaintiff on April 22. (Dkts. 55-2 ¶ 129; 71-1 ¶ 129.)

## II.   Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)). Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III.  Discussion

USERRA encourages service in the National Guard and other reserves of the Armed Forces by protecting employees from adverse employment consequences when absent from work due to military service. Specifically, §4311 prevents employers from discriminating against employees on the basis of military service and from retaliating against anyone who acts to enforce USERRA's protections or otherwise exercises a right provided by USERRA. *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1234 (11th Cir. 2005); *see also Brown v. Houser*, 129 F. Supp. 3d 1357, 1378 (N.D. Ga. 2015) (citing *Lisdahl v. Mayo Found.*, 633 F.3d 712, 720 (8th Cir. 2011)).  The anti-discrimination provision states that a member of the military "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis" of his or her service obligation.  38 U.S.C. § 4311(a).  The anti-retaliation provision states that an employer may not discriminate against or take adverse employment action against any person because that person took some action "to

enforce a protection afforded any person" under USERRA, made a statement "in connection with any proceeding" under the statute, assisted in an "investigation" under the statute, or otherwise "exercised a right" provided by the statute.  38 U.S.C. § 4311(b).[19]

Plaintiff brings claims for both discrimination and retaliation.  He alleges in the complaint that Defendant discriminated and retaliated against him for his military service by transferring him to a position in Sheffield (a more difficult station) when he returned from Afghanistan, "writing [him] up frivolously" upon his return, placing him on administrative leave after he announced his likely re-deployment, and terminating him as a result of the re-deployment.  (Dkt. 1 ¶¶ 1, 17, 26–27, 33.)  At summary judgment, however, Plaintiff only relies on the latter two allegations: Defendant's decision to place him on administrative leave and terminate his employment upon learning of his

---

[19] Although the statute "does not use the term 'retaliation,' the gravamen of [Section 4311(b)] is to prohibit adverse action taken in retaliation for involvement in the assertion of the substantive rights established by USERRA."  *Quick v. Frontier Airlines, Inc.*, 544 F. Supp. 2d 1197, 1208 (D. Colo. 2008).

likely re-deployment.  (*See generally* Dkt. 71.)[20]  The Court thus finds Plaintiff no longer challenges his transfer to Sheffield or the "write-up." *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

Plaintiff's arguments for his discrimination and retaliation claims are essentially the same.  He claims Defendant discriminated against him because of his military service by placing him on administrative leave and terminating him as a result of his likely re-deployment and

---

[20] Plaintiff is not very precise in responding to summary judgment.  At the start of his response, he says that, one week after notifying Murphy of his possible re-deployment, Defendant placed him on administrative leave.  (Dkt. 71 at 2.)  This suggests he relies upon that employment action.  But, at the outset of his legal argument, he acknowledges his burden of showing his military service was a motivating factor in "Defendant's decision to terminate him."  (*Id.* at 16.)  He also repeatedly refers to the termination decision.  (*Id.* at 21, 22, 23.)  This suggests he relies upon the termination decision rather than his placement on administrative leave.  At another time, he claims that "only eight days elapsed between [his] report to Murphy that he [might] soon be deployed and Murphy's request that [Plaintiff] be terminated."  (*Id.* at 25.)  Of course, that was the day Murphy placed him on administrative leave.  All of this is to say, Plaintiff does not speak clearly as to the basis of his claim.  Giving Plaintiff the benefit of the doubt, the Court concludes his USERRA claims relies on Defendant's decision to place him on administrative leave and then terminate his employment.

(alternatively or additionally) that Defendant retaliated against him as a result of his military service by placing him on leave and terminating him.[21]  The same legal analysis applies to both claims.  *See Clark v. City of Montgomery*, 535 F. Supp. 3d 1197, 1209 (M.D. Ala. Sept. 4, 2020) (citing 38 U.S.C. § 4311(a), (c)(1)).

To establish a prima facie case of discrimination or retaliation, Plaintiff must show by a preponderance of the evidence that his military service was a substantial "motivating factor" in Defendant's decision to place him on leave and terminate his employment.  *Ward v. United Parcel Serv.*, 580 F. App'x 735, 738 (11th Cir. 2014) (per curiam).  "A plaintiff's military status is a motivating factor where the employer relied upon, took into account, considered, or conditioned its decision on that consideration."  *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (per curiam).  A motivating factor does not have to be "the sole cause of the employment action."  *Coffman*, 411 F.3d at 1238.  Rather, "it is one of the factors that a truthful employer would list if asked for the

---

[21] The Court notes that Plaintiff's argument in support of his retaliation claim merely incorporates the argument and analysis he posits, in much greater detail, for his discrimination claim.  (Dkt. 71 at 25.)  Plaintiff does not distinguish between the two claims in any legally meaningful manner.  The Court thus addresses them together.

reasons for its decision." *Id.* (quoting *Brandsasse v. City of Suffolk*, 72 F. Supp. 2d 608, 617 (E.D. Va. 1999)).  A court can infer discriminatory or retaliatory motive from considerations, such as:

> (1) the temporal proximity between the plaintiff's military activity and the adverse employment action; (2) inconsistencies between the proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility towards members of the protected class combined with its knowledge of the plaintiff's military activity; and (4) disparate treatment of similarly situated employees.

*Landolfi*, 515 F. App'x at 834; *Annarumma v. City of High Springs*, 846 F. App'x 776, 782 (11th Cir. 2021) (per curiam).

If an employee establishes a prima facie case of retaliation or discrimination, "the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Coffman*, 411 F.3d at 1238–39 (quotation marks omitted).[22]  So, an employee must make an initial showing that his or her military status was at least a motivating factor in the employer's action, upon which the employer must

---

[22] "Unlike the *McDonnell Douglas* framework [utilized in Title VII claims], the procedural framework and evidentiary burdens set out in section 4311 shift the burden of persuasion, as well as production, to the employer." *Maxfield v. Cintas Corp.*, 427 F.3d 544, 551 (8th Cir. 2005).

show that the action would have been taken despite the military status. *Id.* at 1239; *Ward*, 580 F. App'x at 739 ("An employer engages in prohibited retaliatory conduct where it takes an adverse action against an employee motivated by the employee's efforts to enforce the USERRA, unless the employer can prove that the action would have been taken in the absence of the employee's protected activity.").

### 1.    Prima Facie Case

Plaintiff advances a so-called "cat's paw" theory of liability, a reference to a fable in which a wily monkey induces a cat to extract roasted chestnuts from a fire and then eats them all, leaving the cat hungry and nursing a burned paw. *Staub v. Proctor Hops.*, 562 U.S. 411, 416 n.1 (2011).    Under this theory, an employer is liable for discrimination when a lower-level supervisor with discriminatory or retaliatory animus—the monkey—causes a higher-level supervisor with no improper animus—the cat—to terminate an employee. (Dkt. 71 at 1, 17–21.)  An employer is liable under USERRA pursuant to the cat's paw theory only if the subordinate supervisor (1) performs an act motivated by antimilitary animus that is intended to cause an adverse employment action, and (2) that act is a proximate cause of the ultimate employment

27

action.  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 (11th Cir. 2013) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)).

Plaintiff says Gilley, Reynolds, and HR (the decisionmakers) were the cat's paw for Murphy's discriminatory animus.  (Dkt. 71 at 21.)  In attributing this motivation to Murphy, Plaintiff relies on (1) evidence Murphy said "This is not what I need from you right now" when he learned of Plaintiff's possible 2020 re-deployment (2) the temporal proximity between Plaintiff telling Murphy about that re-deployment and Murphy's decision to place him on administrative leave, which caused Defendant to terminate Plaintiff's employment, and (3) Smith as a comparator.  (Dkt. 71 at 18–20.)[23]  Defendant contends none of this evidence is sufficient to avoid summary judgment.  (Dkt. 75 at 3.)

---

[23] On the third argument, Plaintiff says he was treated differently than Smith.  (Dkt. 71 at 20.)  As noted above, "disparate treatment of similarly situated employees" may give rise to an inference that military service was a factor in the adverse employment action.  *Landolfi*, 515 F. App'x at 834; *see also Gipson v. Cochran*, 90 F. Supp. 3d 1285, 1300 (S.D. Ala. 2015).  As Defendant notes, however, Smith was not similarly situated to Plaintiff because she was not a Senior Terminal Manager, was not in the B4 pay band, and was not supervised by Murphy.  (Dkts. 75 at 7; 55-2 ¶¶ 52, 141; 71-1 ¶¶ 52, 141; 71-2 ¶¶ 138, 146–47; 76 ¶¶ 138, 146–47).  Even if Smith was a similarly situated employee, Plaintiff's discussion comparing his record and treatment to that of Smith ultimately fails to address Defendant's discriminatory motive.  Though Plaintiff may

The Court begins with Murphy's comment.  The parties dispute the context in which the comment was made.  Plaintiff testified that, after he said his National Guard Unit was likely to be reactivated, Murphy replied, "This is not what I need from you right now," and hung up on him.  (Dkt. 71 at 18; *see also* Dkt. 63 at 212:11–18.)  Defendant claims Plaintiff said, not only that his unit would probably be activated soon, but he also that Ellison, a Sheffield trainmaster, believed he had COVID-19.  (Dkt. 55-1 at 19.)  Murphy testified he made the comment at issue in response to the latter news because COVID-19 was serious, quarantine rules were constantly changing, and Ellison was regularly in contact with hundreds of employees.  (Dkts. 60 ¶ 24; 64 at 144:11–145:17.)

Defendant urges the Court to adopt its interpretation of the conversation because Plaintiff's is "mere speculation" and "requires a large, illogical, inferential leap."  (Dkt. 55-1 at 19.)  According to Defendant, Plaintiff admits he and Murphy discussed Ellison possibly

---

disagree with the fact he was terminated and Smith was not, he presents no other evidence from which a reasonable jury could conclude that decision was motivated by discrimination based on Plaintiff's military service.  *See, e.g.*, *Herrera v. City of Hialeah*, 2021 WL 5630914, at *4 (S.D. Fla. Nov. 10, 2021), *appeal docketed*, No. 21-14271 (11th Cir. Dec. 9, 2021).

having COVID-19, but Plaintiff cannot remember if that topic was discussed at the same time, whereas "Murphy's testimony and memory was certain." (Dkt. 55-1 at 19 n.9.) That is true. Plaintiff does not dispute that he told Murphy that Ellison might have had COVID-19, and during his deposition, Plaintiff could not recall whether the conversation about Ellison happened on that phone call or at another time. (Dkts. 71-1 ¶ 93; 63 at 212:19–24.) But his inability to recall when the conversation about Ellison occurred does not negate his testimony that Murphy made that comment at issue (and hung up on Plaintiff) in response to news about Plaintiff's likely re-deployment. Both parties supported their interpretation with evidence. Plaintiff testified in his deposition about what happened, and Murphy testified in his deposition and by declaration about what happened. This is a factual dispute.

On summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, Plaintiff. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004). Upon doing so, the Court is left with the inference that Murphy's responsive statement indicated some level of unhappiness, animosity, or frustration about news Plaintiff was likely to be reactivated by the National Guard.

This point is driven home when one views Murphy's comment in context. Up until the phone conversation on March 23, Murphy was continuing to work with Plaintiff to fix the issues.  But upon learning of Plaintiff's likely reactivation, Murphy said, "This is not what I need from you *right now*." (emphasis added).  The temporal element in Murphy's comment highlights his frustration—i.e., that military leave is inconsistent with what Murphy actually needs from Plaintiff right now (that is, his improvement).

There is also the close temporal proximity of eight days between Plaintiff notifying Murphy about the possibility of his unit being activated soon (March 23) and him being placed on administrative leave (March 31).  "The general rule is that close temporal proximity between the employee's protected conduct and the [adverse action] is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000); *Singleton v. Pub. Health Tr. of Miami-Dade Cnty.*, 725 F. App'x 736, 738 (11th Cir. 2018) ("[W]here a decisionmaker becomes aware of protected conduct, a close temporal proximity between the decisionmaker's acquisition of that knowledge and an adverse

employment action will generally be enough to create a factual issue on the causation element."). The eight-day delay here is short enough to fall under the "general rule" of close temporal proximity. *See, e.g.*, *Patterson v. Ga. Pac., LLC*, --- F.4th ----, 2022 WL 2445693, at *11 (11th Cir. July 5, 2022) (holding that one week was sufficient circumstantial evidence of causation); *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (same for five days); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (same for one month).

Defendant tries to shoehorn this case into the exception set forth in *Singleton*. (Dkt. 75 at 4.) There, the Eleventh Circuit explained that "the rule of temporal proximity is not absolute" and can be overcome where the evidence shows the adverse employment action was due to other factors, such as the plaintiff's job performance. *Singleton*, 725 F. App'x at 739 ("[N]o rational jury could infer retaliatory intent from the mere fact Singleton received another citation for failing to be minimally productive—even if the citation followed shortly after an accommodations request."). Defendant says the same finding is required here. (Dkt. 75 at 5.) The Court disagrees. To begin with, *Singleton* is an unpublished opinion, and the exception it sets forth is extremely narrow.

32

*See* 725 F. App'x at 739 ("*Under the unique circumstances of this case*, an exception to the general rule of temporal proximity is warranted." (emphasis added)).  The exception also sets a high bar that is not met in this case.  It requires evidence that "overwhelmingly" indicates Plaintiff's termination resulted from his inability to keep up with the daily demands of his job.  *Id.*

We are nowhere close to such overwhelming evidence here.  Murphy identified nine issues with Plaintiff's job performance in his March 31 email.  (*See* Dkt. 60-1 at 49.)  Defendant says that evidence shows Plaintiff repeatedly missed triggers for trains that exceeded the allowable dwell time, repeatedly said Sheffield was "fine" and "on schedule" despite data to the contrary, struggled to submit the requested time studies, and otherwise failed to perform his job as required.  (Dkts. 55-2 ¶¶ 62, 69, 71, 76, 88–89, 91; 71-1 ¶¶ 62, 69, 71, 76, 88–89, 91; 62 ¶ 8; 63-1 at 51; 65 at 51:7–52:7.)  But, Plaintiff raises a factual dispute about nearly every issue.

In item one, for example, Murphy criticized Plaintiff for saying Sheffield was switching on-time when he left for vacation on March 13, even though a car in the station had exceeded 20 hours.  But Plaintiff

says he left on March 12, there were no timing issues when he left, and

the missed trigger was the responsibility of the night terminal manager.

(Dkt. 71-1 ¶¶ 82, 88-91.)   Murphy's second item alleged Plaintiff

instructed his subordinate managers "to switch for connection rather

than switch under six hours." (71-1 at ¶ 89.)  Plaintiff says that was not

a standing order but rather something he allowed on some occasions *after*

sending a trigger to Murphy and getting no objection to that plan.  (Dkt.

71-1 ¶ 90.) Mr. Murphy next criticized Plaintiff for not working on a train

derailment despite being instructed to do so.  Plaintiff says, first, that he

was not given that instruction and, second, that he directed his

subordinates to address the issue and believed them capable of doing so.

(*Id.* ¶ 91.)  He also says he spoke with his subordinates to asked if they

needed his assistance, and they said they could handle the situation.

(Dkt. 71-1 ¶ 91.)

As his fourth criticism Murphy alleged Gilley asked Plaintiff to

provide station dwell data and Plaintiff only provided data on four

trains—far less than required.  Plaintiff says he sent Murphy an email

with a six-train data set. (Dkt. 71-1 ¶ 74.) When Murphy requested more

information on those trains, Plaintiff collected the data and sent it to Parr

and Murphy on March 9.  (*Id.*)  On March 20, Murphy forwarded Plaintiff's dwell data to Edwards.  (*Id.*)  And on March 25, Murphy forwarded Sheffield's station dwell data to Edwards again, who responded, "This looks good."  (*Id.*)  So, perhaps his data was not so bad.

In items five and six, Murphy criticized Plaintiff for not sending triggers on March 27 and 30.  Murphy alleged that, had he not sent the triggers himself, no one would have done so.  (Dkt. 60-1 at 49.)  No record evidence before the Court shows Plaintiff was required to have sent the triggers before Murphy did.  The evidence thus suggests Murphy may have acted prematurely, thus preventing Plaintiff from sending the trigger as required.  In item seven, Murphy said he noticed a train had sat in the station for thirteen hours without a trigger having been sent. Plaintiff says he was not on duty at the time and Smith or Ellison were responsible for the trigger.  (Dkt. 71-1 ¶ 103.)  In item eight, Murphy took issue with Plaintiff not having his yardmasters handle something called a "4-hour report."  Plaintiff says Murphy never spoke to him about that issue until March 31—the day he placed Plaintiff on administrative leave.  (Dkt. 71-3 ¶ 35.)  And, lastly, in item nine, Murphy said he asked Plaintiff to add Chattanooga traffic to the 102.  According to Murphy,

when questioned over text about why he did not do so, Plaintiff blamed Smith. Yet, when questioned in front of Smith, Plaintiff admitted he did not give her the information. Plaintiff says he passed the information on to Smith, and she failed to pass the information along to the third-shift yardmaster. (Dkt. 71-1 ¶¶ 99–101.) All of this is to say, there is a genuine issue of material fact as to most (if not all) of Murphy's documented criticisms.

The Court is not substituting its judgment for Defendant's employment decisions. The Court notes these issues merely to explain that, while the undisputed facts in *Singleton* established the plaintiff's inability to perform his job duties, the facts here as to Plaintiff's job performance are very much in dispute. And, *Singleton* include no statement of regret or animosity like Murphy's statement here. Indeed, Murphy's statement contained a temporal reference, the word "now," which could be interpreted as evidence Murphy felt some need to act quickly. Murphy's use of that word thus strengthens the causal inference arising from the short period of time between the day he learned of Plaintiff's possible re-deployment (and made the statement) and the day he took action against Plaintiff. Evidence of Murphy's statement in

response to Plaintiff's possible re-deployment, the tight temporal proximity between that statement and Murphy's decision to place Plaintiff on administrative leave, and the factual disputes about Plaintiff's job performance distinguish this case from *Singleton* and create a factual issue on the causation element.[24]

### 2. Affirmative Defense

To obtain summary judgement, Defendant must present undisputed evidence that it would have terminated Plaintiff despite his protected activity. *Coffman*, 411 F.3d at 1239; *Murphy v. Radnor Township*, 542 F. App'x 173, 177 (3d Cir. 2013) ("Courts have held that summary judgment for the employer is appropriate if the employer can produce uncontested evidence that it would have taken the adverse employment action even in the absence of an improper motive."); *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 314 (4th Cir. 2001) (granting

---

[24] Defendant also provided the Court with some cases that say temporal proximity will not suffice to show causation when an employer contemplates a given action before the protected activity takes place. *See, e.g.*, *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006)*; Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). But that did not occur here. No evidence suggests Defendant contemplated terminating Plaintiff before Plaintiff notified Murphy of his likely reactivation.

summary judgment where the employer presented evidence which "clearly established that it would have fired [the employer for the proffered reasons] even in the absence of any improper motive"). "All that is meant [by this standard] is that if the [employer] had two reasons for taking an adverse action against the [employee], one of them forbidden by the statute and the other not, and the [employer] can show that even if the forbidden one had been absent the adverse action would still have been taken, the [employee] loses." *Madden v. Rolls Royce Corp.*, 563 F.3d 636, 638 (7th Cir. 2009). In other words, to be entitled to summary judgment, Defendant's evidence must be "so compelling and so meagerly contested . . . that a trial would be a waste of time." *Snyder v. Nabors Garage Doors, LLC*, 2022 WL 1231696, at *8 (N.D. Ga. Mar. 15, 2022), *appeal docketed*, No. 22-11286 (11th Cir. Apr. 18, 2022).

Defendant contends it terminated Plaintiff because of his repeated failures and misconduct—those things documented in Murphy's March 31 email. (Dkt. 55-1 at 23.) As discussed above, factual disputes exist as to the extent of Plaintiff's inability to perform his responsibilities as a Station Master. Put differently, there is a dispute as to the accuracy of Murphy's criticism. And then again, there is Murphy's statement that—

interpreted in the light most favorable to Plaintiff—evidences animosity to Plaintiff's military service and his decision to place Plaintiff on administrative leave and recommend his termination so quickly after making that statement. Finally, Plaintiff has presented evidence Defendant relied on Murphy's assessment in terminating Plaintiff, thus precluding any suggestion Defendant made a decision independent of Murphy's motives. For all of these reasons, the Court concludes Defendant has not presented uncontroverted evidence it would have terminated Plaintiff's employment regardless of his possible re-deployment.

## IV. Conclusion

The Court **DENIES** Defendant's Motion for Summary Judgment (Dkt. 55).

**SO ORDERED** this 6th day of September, 2022.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE